All right, could we call our case document for today, please? Case number 17-0506 and re J.S. a minor. Will the parties presenting argument please come forward and introduce yourselves? Spell your last name for the record. Ingrid Gild, assistant public defender on behalf of the mother of Maria H. Assistant public defender Stephanie Foster, who wrote the brief, has a schedule in conflict, so I'm Stephanie Foster. It's Ms. Gild? Ms. Gild, G-I-L-D. Okay, thank you. I'm assistant public guardian Jean Agathon. The last name is spelled A-G-A-T-H-E-N. And I represent the minor whom I'd like to call Jacobin, his first name with the court's permission, even though the brief used his initials. Well, don't the rules also suggest, excuse me, that if the name is unusual, that it should not be used? They do, Your Honor. That's why we use the initials in the brief since... Well, I would suggest we refer to the minor child as the brief student. All right. That's the oral argument today. Thank you. That's what I think the rules suggest. Okay, fine. Thank you. Verification on behalf of the mother, I'm objecting to the child's first name being used because it's easy to identify the child. So just for the record, I'm objecting to that. On behalf of the mother... We're granting your motion. Thank you. Sure. State? Good morning. Assistant State's Attorney Nancy Kisicki. It's K-I-S-I-C-K-I on behalf of the people. Okay. What we're going to do in this matter is we're going to give 20 minutes per side and do we have a division worked out between counsel? Yes, Your Honor. I've discussed with the public guardian. We've divided it by issue. The public guardian is going to address best interests and we're going to address forfeiture. I believe they're going first, but without knowing how the argument's going to go, we've agreed to sort of be flexible on that. Okay. Very well. Just a clarification. When you order a presentation, where does the mother come? Do they come first? Do they come second or third? I have not been privy to these private conversations between the public guardian and the State's Attorney. Well, you're the appellant. That's what I thought. So you will go first. You wouldn't probably have been privy to their... They're sort of on the same side, so we thought they would divide up their time. Maybe. Maybe. Okay, fair enough. So, Ms. Gill, you have the floor first. Thank you, Your Honor. I assume you're going to want to reserve a few minutes for rebuttal as well. Yes, of course. Good morning, Your Honor. Ingrid Gill, Assistant Public Defender, again, on behalf of Maria H. Just as an opening, I thank the Court for taking the time to do an oral argument on an expedited child protection appeal. This case presents an interesting question. Clearly, the Assistant Public Defender took liberty with including into the common law record the prior permanency hearings and the deposition hearing to make her argument that her interpretation of one of the criterias of best interest, the uniqueness of the family, required her to go back and incorporate prior permanency hearings going back to 2014, 2015, 2016. Now, the case she cites of Ashley K. says that an appeal brings up the whole record and on appeal, all interlocutory orders in the record may be considered by the reviewing court in order to grant the relief that the case may require. These principles are especially applicable and clearly warrant application in a child custody matter. Now, that case actually cites to Beguy, B-I-A-G-I versus O'Connor, which is actually an Illinois Supreme Court decision, 18th Illinois 2nd, 238, page 241, 1959. Mom takes a position that she's making a good faith argument for the expansion, modification, and possibly reversal of existing law. How you interpret the uniqueness of a family triggers the analysis. The reason why she resorted to the prior permanency and even the deposition order, it gives a background of this case. Because one of the problems I had with the case when I'm reading the briefs, and I'll admit I found the briefs written by opposing counsels very good. I appreciate the factual detail since I came into the case two weeks ago. But what disturbed me about this, that this probate petition for private guardianship amounted to a de facto ex parte emergency hearing for the determination of legal guardianship, which is drastically different than the guardianship under a juvenile court act. And what I found disturbing was it's filed January 17th. It's heard January 20th. The court record shows that mom had already had three of the youngest children return to her. That is insufficient notice for a mother to appear. And under a federal due process, procedural due process, this amounted to a de facto parental rights termination. Because legal guardianship means that the legal guardian can decide that it's not in the best interest of this child, this 15-year-old, to have visitation. Isn't he 16 now? He's 16, but at the time in question he was 15. And so I'd like to limit it to what the court had on January 20th. Ms. Gill, I do want to ask you something. Aren't you raising something new now that's not in the briefs, that this was a de facto termination? I am, Your Honor. I don't know that that's appropriate. It may not be, but in the interest of social justice and the African-American family, that this impacted the African-American family. This mother had been at all the other permanency dispositions. She had a right to confront her 15-year-old son, to hear him specifically testify. And she did not have that opportunity. Well, I don't know that, you know, I don't know that you can allow this, you know, hearing off. And there's nothing about this in the briefs at all. That is correct, Your Honor. And wouldn't it be more appropriate for you to ask the court to file a supplemental brief? It would have been if I had time, Your Honor. Well, let me ask you this. I want to say, can the parties tell the court when the school year begins for this 16-year-old young man? I'm going to assume that it's August, as most schools do. He is 16, and clearly. High school. High school, no question. I mean, isn't it within a week or two? Exactly, Your Honor. And the date for filing of this appeal is the 21st. It's 150 days from the notice. Yes, and the mother filed. Actually, I think this was extended. You are correct, Your Honor. The mother filed pro se, and as the court noticed, and the public guardian actually filed a motion not to use the child's first name. Because the mother didn't understand what was going on. And she has done everything that was required. And so the argument is, if you look at the uniqueness of the family, this is a family of nine children. They came into the system in 2012 with seven children from a marriage. This case had a deposition hearing within the time limits, and it was a return home. Then there was a first permanency hearing in 2013, return home. But by 2014, the court acknowledged that while they didn't want to terminate the mother's parental rights, the return home had changed to guardianship. Then there was a 2014 where she was present at the hearing, as the public guardian points out. What I find disturbing in this case is the court tells her when she says, can I still fight for my son? Because permanency hearings are modifiable. They're not final appealable orders. Clearly, they're interlocutory. And the court says, of course you can fight. The problem I have, when the court says you can fight, did that not trigger an obligation on the judiciary to admonish the mother of her apparent rights, which were interlocutory in nature? And that's a case of first impression. And I admit it's not in the brief. But it's disturbing because Mom never had any idea that the juvenile court act would not apply. There's nothing in the records to indicate that anyone in the judiciary, and there are three different judges on this case. Yes. Okay? But nowhere do any of these judges explain to Mom that this case can transfer over into probate law, which means legal guardianship means that, Mom, you may want supervised visitation, but it would be up to the legal guardian to decide if it's in the best interest. And that is a significant distinction of when we look at the Probate Act and how this case, the specific facts of this case that I find troubling. I would concede that on the January 20th hearing, you heard the son, the 15-year-old son, you heard two caseworkers, and you heard the foster mom. The court only needed one criteria for best interest. I'll concede that. I don't believe there's any case law that says out of all the factors listed, you've got to have two, three, four. One would be sufficient. Is there any case law, going back to how you began, is there any case law that you're aware of that says that a guardianship order is akin to or like a de facto termination order? No. It has the implication, though, because we can't ignore the effect of it. There is a legal distinction between guardianship orders imposed under the Juvenile Court Act and guardianship orders under the Probate Act. There is a legal significance. For her to go into probate court, she has to show a substantial change in circumstances. The Juvenile Court Act, matter of fact, the Juvenile Court loses jurisdiction. These proceedings were not conducted in probate court. No, but they conducted a probate matter, which is the legal guardianship, which meant that if they granted it, the Juvenile Court lost jurisdiction. Now, again, you're raising another argument that's nowhere in any of the briefs, and I really don't see how we can permit this. Well, I think, Your Honor, in the interest of children, that we should never rule out technicalities. I realize that judicial ---- I don't have a problem with that. You have options. You can ask for supplemental briefing, but you can't show up at an oral argument simply because, you know, the author of the brief is not here and can't be here. I mean, like I said, you have options. I think today you should be arguing the case based on the brief, and if you wish to ask the court for supplemental briefing, and keep in mind that, you know, we have the interest of a child who needs to know where they're going to school within a couple of weeks. And I acknowledge that, Your Honor, and that's why I ---- It's really important that we don't forget the best interests of the child either. And I think the best interests of the child, certainly one of them, is where and how he goes to school, and that he knows where he's going to be going in a week or two. Your Honor, I think the record will show that the State, in their motion for an extension, conceded that I was objecting to any extension. This is 150 days. This child has a right to permanency. The question is, did the mother have a right to confront her son? And did the court consider the uniqueness of the family? Because, yes, there are nine children involved, three children were returned home. The public defender on this case asked two questions on cross-examination of the first caseworker. There was no representation by the public defender. And the record is deficient as to whether the court ever considered the uniqueness because this is not a case where the mom never did anything. She did as much as possible, and the court ---- But, Ms. Gill, time went on while she was supposed to be doing this, and children grow up. Exactly. And all of a sudden you're looking at a 15-year-old who has a very stable environment and has done extremely well in that environment. So isn't it incumbent on her at some point to get it together quick because they grow up? I don't think the record says she didn't. I think the record said that when the court had to look at the temporary custody and the best interest, the 15-year-old was with one brother in the foster mother's care. What the record doesn't show is that the third brother was in the same foster care but chose to return home. The two oldest children was clearly ---- Well, did he choose to return home? I don't think he was of the age where he chose to return home. Well, I think children's desires and their feelings and their testimony is valid. Even someone as young as 4-year-old, the court has a duty to consider what the child considered. I don't think a judge will be more inclined or actually more likely to consider and give more weight to a 15-year-old or 16-year-old who says, Judge, this is what I would like to do and these are my reasons, as opposed to a 4-year-old who says, I want to go home to be with my mom. Well, there's case law that supports the court's decision to keep a 4-year-old with the foster mother. I think in this situation ---- Let me answer the question. But this court was within their jurisdiction and within their judicial power to consider the 15-year-old's testimony. We're not disputing that. What we're disputing is that the court had an obligation to consider the uniqueness of this family that the mom and his siblings wanted him to return home. Well, and why do you say that the court didn't consider that? The court doesn't have to spell out what it considered in its ruling. There's no requirement in any of the cases that the court specified, I consider this, that, and the other thing and put it in writing. There's no requirement that that be done. And actually, I think the record suggests that the court did consider that there were nine children in this family. I don't think it in any way neglected to consider the uniqueness of the situation. This is a very unusual situation where some of the children, the younger ones, have been returned home. You said only three of the nine. Is that correct? That is correct. So six of them are still out there. As an officer of the court, I did speak to the mother. When I spoke to her yesterday, there's five that were returned. Five in that? Yes. And at the time of this, only three were returned. Only three. And there were three youngest children. They were, Your Honor. And that's why the last permanency hearing, I think the. . . Where is the oldest daughter? She's with Mom. And where. . . there's three boys with this foster mother. No, there's two boys with the foster mother. The court decided that the youngest of the three would be returned home. It was in his best interest. And where are the other two children? I believe. . . I don't know, Your Honor. I asked her that because she said there was five. And I'm counting also. There's one unaccounted for when I spoke to her yesterday. So five children are returned. And there are four children that are in different placements. Is that what you're telling us? How does that make this case unique when five of the children are at home and four are still elsewhere, apparently under the guidance of the juvenile court? It's under the. . . That's my understanding. And I think it's unique because it's an interesting case where you have seven children born of a marriage, two are subsequently born during dependency, since this case came into the system in 2012. And Mom did everything that was asked of her. But because. . . one of the problems with these cases, as you know, is from 2012 when the kid. . . you know, this young man was only 12. And we're now here. . . 20 years later. Exactly. And the children change. And yet I think it's no fault of the parent. And one of the criteria is the uniqueness of the family. And that she had. . . she is cooperating. She's working on the return of her children. And is this. . . clearly foster mom had. . . she was a single foster mom. She had the two children. She had undivided attention for these two teenagers. And we're not disputing that. But in large families, the reality is older siblings take care of younger siblings. And a criteria of the 15-year-old saying, I don't want to have to be a babysitter for my younger brothers, is not an appropriate criteria. I agree that the appropriate criteria is he wants to stay in school, he wants to stay in sports. But there's nothing in the record that says. . . And he's doing very well. And he's doing very well. But there's nothing in the record that says that if he had been with mom, that he wouldn't stay in the same school. He didn't only say, I don't want to be a babysitter for my siblings. He also had some problems with his mother, right? Yes, Your Honor. I can see that the January, the last time a visitation was Thanksgiving in 2015, he was feeling pressured not only by the mom, but by his sister, his siblings, to return home. And he and the youngest brother left the house without the coat. And foster mom had to pick them up in November, winter. And so the question that mom is advocating, if there had been family therapy. . . He had individual therapy. We acknowledge that. And he expressed his reluctance and reservations to leave a home where it was just him and his brother, where he had the undivided attention of a foster mother, to return to his biological family, which is a large family. It's like the Waltons, only it's African-American. And it's a major urban city. That is the. . . There's really nothing like the Waltons. I might be having a senior moment sitting over there after I've watched it. And so that's the specific facts, what mom is saying. And, yes, she is making a good faith argument for an expansion of how we define unique family in the African-American context. And there's nothing to say that the foster mother is not African-American, because I believe she is. But there's nothing in the record that said that the child couldn't have, with family therapy, where there was communications between him and his mother, that they could have at least addressed his reservations. He had issues. He had anxiety. He expressed it in, you know, the individual therapy sessions. The question was, did the court, under these circumstances, was it against the manifest weight, if you make the argument for an expansion of existing law and how we define uniqueness as a criteria, and how do we relate that to what the child expressed, which are valid considerations. No one is disputing that he made a valid. At a 15-year-old, he was very intelligent. He was articulate. But mom never had an opportunity to hear from him. And that's what leaves the open wound in her soul, because she doesn't understand what happened. So that is my argument, if there's any further questions. Thank you. We'll give you a few minutes for rebuttal. Thank you very much. Ms. Agathon, are you going to be? I'm sorry, do I have you as Ms. Agathon? Yes, that's correct, Your Honor. Thank you. Yes. Absolutely. And I will try to remember to use my client's initials. I apologize in advance if I slip up and use his name. I'd like to begin by responding to several of counsel's points. First of all, the mother in this case was represented by counsel throughout this proceeding. Counsel was at the hearing, the guardianship hearing, in January of 2017. She did not object to the hearing going forward. She did not ask for a continuance. Was it as expedited as Ms. Gill said, three days notice? That is true, Your Honor. What's the explanation for that? Do you know? I think that's the usual practice at juvenile court. Everyone typically is aware beforehand that a motion is going to be filed, and that's pretty much standard. It wasn't an emergency motion? It was not. I believe three days is the minimum, is minimum sufficient notice. But the case was previously set for that date, correct? And then they just piggybacked a motion onto it. Your Honor, I can't actually answer that for sure. Okay. What I do know is that the mother was represented by counsel. She never asked for a continuance. She never explained why the mother was not there. I failed to see a due process. I don't believe there's any due process issue there. The mother's desire to have the boy returned, the minor returned, was pretty clear on the record, wasn't it? She didn't testify. She wasn't there. Correct. Wasn't there significant testimony that she had made that point emphatically to her son? Not at the hearing of January of this year. Not at that hearing. Not at that hearing. There was no objection made. There was no accusing. Well, I'm sorry. What I'm saying is at that hearing, wasn't it fairly clear from the testimony that the mother very much wanted J.S. to return home? No, Your Honor, it wasn't. There was no testimony whatsoever about, to the best of my recollection, about the mother wanting J.S. returned home. You know, I really want to kind of correct something here. It appears to me that there might be some confusion here, and I think the Court, we need to know this, but it appears to me, unless I'm reading things wrong, that in January of 2015, January of 2015, this matter was continued for the goal of private guardianship. Okay, that was two years before the petition to appoint a guardian was actually filed. Correct. So there were two years previous to all this that the Court was already continuing the matter for the goal of private guardianship with this foster mother. That's correct, Your Honor. How is January two years later a big surprise that there's a petition to appoint the guardian of the person of the minor? Well, in fact, Your Honor, the goal of private guardianship was set by the Court in October of 2014. That's when the goal of private guardianship was set.  from return home to private guardianship. So it was more than two years later that the actual motion was filed. All right. So this isn't really something like pulling the out of the mudder. Correct. But on January 17th, we're talking about a year and a half after the goal had changed from return home to the possibility of a private guardianship with this foster mother. Actually, I wrote it over two years ago. And that's January 17th. DCFS actually filed a petition to appoint a guardian of the person of the minor, private guardianship. Correct. And it asked the Court to find that JS was in need of an appointment of a private guardian. And you're saying that the statute generally envisions either at least a minimum of three days before the hearing would take place. Correct. Which is what occurred here. That's correct. And which is when the mother didn't appear. Correct. All right. And just so the record's clear, this was not something that happened in the three-day time span. No, that's correct. The goal did not change. And then three days later, after the goal changed, they filed the motion. It was over two years later. I would also like to clarify what counsel said about the family composition. There were seven children who came into the system in 2012. Seven. And to the best of my knowledge, only JS and his younger brother, who were placed in the same home, are still not returned home. So the numbers are a little bit confusing, but there were different children who returned home at different times. Well, what is your response to counsel's point that the trial court didn't really consider the uniqueness of this situation, where you have parents who have seven children returning with them, apparently have completed the goals that were suggested, and then the two older children. And we're not concerned with ‑‑ we're only concerned with JS right now. Correct. Your Honor, there ‑‑ that's complete speculation on counsel's part. That's not an argument. That's speculation. It's also important to remember that the same factor and the best interest factor in the Juvenile Court Act that talks about the uniqueness of the family then says, and the uniqueness of the child. So it's not ‑‑ It would make sense that if you're actually considering the best interest of the child, that would mean you're focusing on that child, not the eight siblings that are involved. Correct. And yet at the same time, the court is allowed to consider the uniqueness factor. That's absolutely correct. But each child is a different ‑‑ is a unique case. For example, JS was 11 when his case came into the system. Some of the younger siblings were one year old, two years old. They didn't have the same experience at home. The reason the case came into the system was domestic violence, and the mother had a DUI. She was also incarcerated somewhere in Indiana at the time of temporary custody. So the older children in the family, including JS, of course, he's the oldest in the sibship, had a very different experience at home. And their experience both at home and then subsequently in the foster home is a very important factor. So not each of these children experienced the same thing. And the uniqueness of each child is very important. Second, I do want to revert to go back to address what counsel said. If I understood her correctly, she said that if the case closed to guardianship under the Probate Act, then the juvenile court lost jurisdiction. And that is not correct. I would ask the court to look at Section 2‑33.1 of the Juvenile Court Act. And Section 2‑33.1 talks about the juvenile court's continuing jurisdiction in a case where, it doesn't use that phrase, and I apologize, but it provides for a party to come in with a supplemental petition to reopen a Juvenile Court Act case if the case closed to guardianship under the Probate Act. So, in fact, and I believe the case of the Second District case of Enright, T.R.O., 2005 Second District case talks about this. If a Juvenile Court Act case closes to private guardianship under the Probate Act, then the juvenile court maintains continuing jurisdiction. As the court's order in this case specifically did. That's at page 126 in the common law record. The order of private guardianship specifically says this court maintains continuing jurisdiction of this case to enforce and modify these orders. So it is absolutely not true that the juvenile court's jurisdiction over the case closed if guardianship was established under the Probate Act. I would like to turn then to consideration of J.S.'s best interest, and I need to start that by emphasizing that the choice before the court in January of 2017 was not, should this child go back home to mother or should this child stay with the foster mother? That was not the choice the court faced. There was no motion for return home pending by the mother. The mother had been found unfit and unable to parent Jacobin in December of 2012, and that had never been modified. Mother had never requested modified dispositional findings. She had not asked the court to find her fit, willing, and able as to Jacobin, excuse me, as to J.S. And she had not filed a motion for return home. So the decision or the options the court had in January of 2017 were, do we let J.S. linger on in this impermanent state of foster care, or do we respect and follow the Juvenile Court Act's instruction that children who have to be removed from their parents should be given a permanent home at the earliest opportunity? That's early on in the Juvenile Court Act. So the choice was, should we place Jacobin in private guardianship as the DCFS motion requested, or do we let J.S. linger in foster care? And as you know, the trial court did find that J.S. was thriving in the foster home, that he wanted to stay there, and that that was the best resolution of the case. So the only issue in this appeal, therefore, the only issue, is whether the manifest weight of the evidence supports the trial court's decision. And as I'm sure the court is aware, there was absolutely no evidence that it was not in J.S.'s best interest to go into private guardianship with a foster mother. He had been in the home for nearly four years. He wanted to stay there. According to the caseworker, he spoke very highly of Crystal B., the foster mother, whereas his interactions with his mother were primarily negative. He wanted to stay with Crystal B. in private guardianship. He was ready for his case to be over. He was tired of the Juvenile Court Act case going on. The caseworker testified that he had a good, bonded relationship with Crystal B. And Jacobin also himself told the court that he was very, very comfortable there, that he had been there nearly four years. And the caseworker testified that he felt as though Crystal B. was very interested in his success all the way around. His grades had gone up since he had been in that home. Crystal B. was very interested in his academics and his athletic activities. He played basketball for several teams. She went to all of his games. He was in a very comfortable situation in that foster home. He wanted to stay there. He told the court he didn't trust his mother. When you look at all the best interest factors in the Juvenile Court Act, you can take them all off, and they're all satisfied by private guardianship in this case, particularly its subpart D that talks about the child's sense of attachment and being valued, the child's sense of security, sense of familiarity, the continuity of affection for the child, the least disruptive placement alternative for the child. And then the next section talks about the child's wishes and long-term goals. Now, no one factor is dispositive. There's a lot of case law that says that. There's ten different best interest factors, and they're all important. But I submit to the court you won't find a single factor that did not weigh in favor of private guardianship in this case. I should also mention that Crystal B. also spoke at the guardianship hearing, and although she wanted to be J.S.'s guardian, she recognized the importance of his relationship with the Byrd family, and she said she certainly understood that parents would continue to be entitled to at least monthly visitation. She was fine with that. She understood that that was going to be their right. I should also point out that there had not been a visit. At the time of this guardianship hearing, there had not been a visit between J.S. and the mother of the parents for over a year. Well, that was because of the Thanksgiving visit. That's correct, Your Honor. And the caseworker, after that somewhat disastrous Thanksgiving visit, the next month, December of 2015, the caseworker offered to the mother to go into family therapy with J.S. to try to work on these issues. But didn't J.S. refuse to have family? Wasn't it his choice? He's been going to individual counseling, hasn't he? Correct. But he did not want to be involved in family counseling because of whatever. There were reasons stated. Right. Your Honor, that was, to the best of my recollection, that was earlier in the case. He was offered family therapy with the mother, and he said no because she yells at us and she tries to put us down and we can't talk to her. So at an earlier point, J.S. and his brother refused, indicated they would not wish to participate in family therapy. However, in December of 2015, after the disastrous Thanksgiving visit, the mother said no, she didn't want to do family therapy. It was too soon. Too soon. The children had been out of her home for. . . You didn't make a forfeiture argument in your group, did you? That's correct, Your Honor. We did not. Well, we're going to have to hear about that forfeiture. But you did not make one. We did not make one. You agreed you didn't raise forfeiture. We did not raise forfeiture. All right. That's correct. So in sum, because of all the evidence presented at the guardianship, all the evidence presented at the guardianship hearing showed that going into private guardianship with Crystal B. was in Jacobin's, excuse me, J.S.'s best interest. And that is what 15-year-old J.S. wanted, and the caseworker testified that would be in his best interest. Jacobin, excuse me, J.S. asks the court to affirm the trial court's orders of January 2017. Thank you, counsel. Ms. Kozicki? Good morning again. With regard, I do want to address forfeiture, and I do plan to address that. But first, with regard to the public defender's new arguments that were raised today, as far as good faith extension of uniqueness and due process, I mean, we have to object to that. I don't think it's proper under Rule 341 to bring up new issues at oral arguments, so we do just in passing object to that. In addition, it seems to me that the argument became very complicated in terms of what happened in this case. It was the children, this minor, along with some siblings, came into care in 2012. In Kane County, it went to adjudication. It went to disposition. There was a finding of neglect, environment, and injurious. He was placed under DCFS guardianship. The case was transferred to Cook County. It got here. It went through several permanency hearings. The first one in December of 2013, the permanency goal was return home in 12 months. But then, as the public guardian was saying, by October 24, 2014, the goal for JS became private guardianship and continued to be constantly private guardianship throughout that entire period. There were several other permanency hearings where that goal was reaffirmed. So, again, it wouldn't have been a major surprise that the case would eventually proceed toward the goal, which was private guardianship. When the DCFS petition to appoint Crystal B. as the private guardian and motion to vacate guardianship, terminate worship, and close the case came before the juvenile court, the mother never raised any objection, even when the juvenile court judge just before ruling said, and there are no objections as to any of the other parties. Now, in appeal, the mother would like to argue the decision has to be overturned because there are various things the juvenile court should have considered or should have considered in a different way. But those arguments are forfeited because she never presented them. May I ask you, at the January 2017 hearing, although the mother was not present, there was an attorney there representing her. Yes. So she was present by counsel. Yes. Was there – explain this three-day provision. The minimum to have a hearing on a right to private guardianship is three days at least? I did look this up with the court's permission. There is a – I'm looking at Rule 19A.10, which has to do with motions. I think this is a child protection rule or a circuit court rule. After the petition is filed, all requests for action shall be made by motion. Motions and notice of motions will be made pursuant to the code of civil procedure, Supreme Court rules, and rules of the circuit court. And then I'm looking at 735, ILCS 5-2-620, practice on motions. It says the form and contents of motions and notices shall be according to rules. And then finally, this is, I believe, rules of the circuit court, 2.1, notice of hearing on motions. It says, A, notice required. Written notice of the hearing on all motions shall be given to all parties. And then under C, if notice of hearing is given by personal service, which I believe is what happened here looking at the proofs, the notice shall be delivered before 4 p.m. of the second court day preceding the hearing on the motion. So I think the long and the short of it is three days notice. Can I ask you, do you agree that the record definitively suggests that a year and a half before or almost two years before the January 27, 2017, permanency hearing, the goal had already changed going back two years to private guardianship? Right. The goal had been private guardianship for all that time, yes. So this wasn't a surprise petition. Right. And, in fact, there were hearings conducted during that timeframe regarding J.S. and how he was doing in the foster home. Right. There were multiple hearings. Yes. All of which the mother was actually present for. Right. And everyone knew that was the goal. And there's nothing in the record showing the mother ever appealed that goal. No, and I understand. I just wanted to clarify, and I will ask the skill, if the record is somehow incorrectly suggesting that for over two years there was a suggestion that the court was moving towards a permanency goal of private guardianship with this foster mother for this particular child. We're not talking about any of the other children. Right. How is this forfeited, though, the issue of whether or not the court erred in a manifest weight determination simply because she wasn't at that hearing that day? Her lawyer was there. Right. We understand. I'm sorry. It was DCFS's motion. DCFS had the burden to prove their case, and we understand that. However, the mother's attorney was present, and mother is now wanting to raise certain arguments about certain evidence that the juvenile court judge didn't consider, didn't properly consider, some of which came from other hearings. And Judge Lewis, who heard the hearing on January 20, 2017, this is the first time in the record that she's handling the case that we could see. So the arguments that she's wanting to make now were forfeited because she could have raised them in this hearing, and she never did. These particular arguments that you should have looked at this other time. Your argument is that she's forfeited the right to challenge the permanency goal that the court entered in this case? The court didn't enter a permanency goal. I'm sorry. The private guardianship order. The private guardianship order. Right. Our argument that we made in our brief is that she forfeited the argument. Even if it's not quite that strong, the forfeiture argument, we stand behind the argument that the arguments that she's trying to make now are forfeited because she's suggesting that the court made a mistake in not considering evidence that she never brought in, that was not before this judge. It came from other hearings on other dates. Do you know when school begins? I don't know when school begins, but on that point, I think it's important to note that even if this court were to reverse the private guardianship, DCFS has placed this minor in this foster home. It would revert to DCFS guardianship, and there's no suggestion that DCFS would be moving this minor in the near future. So the issue was should he remain under DCFS guardianship with the juvenile court case open, or should he be under private guardianship with the case closed, which is what he wanted. So a reversal would only change the guardianship to DCFS. Right. That's my understanding. It would not revert to the mother. Right. It wouldn't revert to mother. And also I think it's important to note that this was not in any way a termination of parole rights. Under DCFS guardianship or under private guardianship, the mother has the same rights. Even with the case closed, she can come back into court and ask for a modification. You know, I want all parties to know that I don't think that, and I think I speak for the panel, I don't think that we're going to be considering an argument that somehow a private guardianship order is akin to or equal to a termination of parole rights for multiple reasons. One, it has never been raised in the brief. Two, I don't believe there's case law to support it. And three, you know, the main reason we set this for oral argument, one of them, was because school is beginning and school is very important for every child, particularly this child who has apparently been doing quite well and is about to start, you know, I think it's junior year in high school, maybe not, but I think so. And, you know, we as the appellate court also have to consider, you know, the best interest of this child in school is obviously one of the important things. And I'm not saying that that's the only thing. But, you know, we have rules that require us to get out these orders in a certain time frame, which we intend to do. But anyway, I don't see that the court is going to consider an argument that wasn't raised in the brief. It's not allowed by 341, and I don't see that we would omit it. And I don't think it's, you know, I don't think now it's the time to order supplemental briefing because school is about to start. So you can continue in your forfeiture. Thank you. Basically, that's all that I'd like to present because the mother forfeited her arguments, and more importantly because, as the public guardian argued, it was overwhelmingly in this minor's best interests for the orders to be entered. We're asking that the orders be affirmed. Okay, thank you. Ms. Gill, I'll give you a few minutes. In response, Your Honor, the family unit is a fundamental federal right under Stanley v. Moore. I don't think what I've heard today of how the pattern and practice in abuse and neglect or child protection of filing a petition for private guardianship and then three days later actually having the hearing under the justification that mom is represented by counsel is justice. It's assembly line justice. It's a pattern that I frown on, and I'm sorry, there was no emergency that this mother couldn't have been continued a week. Now, having said that, is it Tom Follera, though, and I have to concede, there's a reason why there's 150 days. And the mother is clearly aware of that. The representation she received on January 20th under a federal constitutional review amounted to ineffective assistance of counsel versus Strickland v. Washington. The problem is clearly when you ask only two questions on cross-examination, when you clearly don't ask for continuance to have the mother there, that's ineffective. The problem is can you make the second prompt? Ms. Gill, I really need to get from you one thing. Is it clear that the record of these proceedings indicates that as far back as September 2015, the caseworker who had been studying this case, who had been preparing reports, who constantly testified before the juvenile court, had suggested a recommendation of maintaining the goal of guardianship for both boys, but were concerned with J.S., that that was the goal as far back as two years, that they were doing well with this guardian, and the goal was not for them to go back home, but the goal was actually to continue the guardianship with this foster mom? Your Honor, the problem is not the date of January. I mean, October of 2014 when we had the change in the permanency hearing. And it's not the January 2015 and February 2015 when the case came up on a motion for unsupervised visitation by mom. Yes. The case went back on track because that was denied. The motion for unsupervised was denied. But at that time, the caseworker spoke to the court. Yes. Where this case gets muddled is what happens on March 4th, 2016, which is most significant, because the court, there's a long, matter of fact, it's either the state or the GAO actually reproduced the exchange of what that judge, who's now the third judge on this case, had not participated in the earlier permanency hearings. And when, again, it's the goal of permanency. They considered it. And the mom says, I think you're going to keep the goal as guardianship. Does this mean I can't fight for my son, fight for my children? And the judge says, no, not at all. And that's where the case gets derailed because it's no longer clear to the mother that the state and the guardian are moving to private guardianship. Because this happens March 4th, 2016. She's thinking there's going to be another permanency hearing, that she's getting a chance to fight. That's the significance why the case gets derailed. And when the public guardian files a petition for private guardianship on 2017 and proceeds three days later and the mom's not there, that's where the injustice happens. What is the primary goal of the Juvenile Court Act in these kinds of cases? Not delinquency, but abuse and neglect. What is the primary goal? Well, it depends on how. I think you're using it as a singular. And I would say that that's a false premise. All right. Well, then what are the goals? It's the preservation of the family and the best interests. And the question is, was that attained? Because clearly the mother's rights aren't being terminated. But her right to supervise visitation is muddled. And it's more of a procedural due process problem that I'm having with this. Does the case being closed prevent visitation? Yes, because the private guardian now has the sole discretion. Right. Did she indicate in her testimony that she would in no way interfere or try to block or prevent the mother and the father from visiting or there's no problem with them attending sporting events? Didn't she indicate all that? She did testify to that. But there is no judicial order in the private guardianship. And I might be wrong, but I don't believe there is a – in the private guardianship order, I don't believe there's a supervised visitation order entered. Do you think there – oh, I'm sorry. I don't remember there being one. I'm sorry. Do you think this record suggests that it would be in the best interest – that the finding that the court made that it was in the best interest of the minor to remain – to have the permanent guardianship invested in the foster mother, that this record suggests that that is manifestly against the weight of the evidence? Honestly, I do only because I'm disturbed by the procedural due process. And we don't know what mom would have said. We don't know if – if DCFS had regained custody, if they'd maintained custody based on what this judge, third judge, in March of 2016 said, that the child would have changed schools. I mean, literally, I don't think custody would have changed. I don't even think that the mother where she lives now is far from the foster mother. I think they're in the same neighborhood. Do you agree with counsel that if we were to reverse this, that guardianship would return to DCFS and not the natural mother of this child? Yes, it would return. And it's really a procedural federal due process. And then where would the child be? Where would the child be? The child would still be with the foster mother. Because clearly, you know, we're now going, is it harmless error? So really, would we really grant you any effective relief? The effective relief would have to be expedited because mom is concerned that the child not be disrupted. The child should be stopped in school at the end of August. And I think if we remanded it, it would just be for to preserve that there is no federal violations. Because clearly, this is assembly line justice, the way this pattern and practice of doing three days just because the circuit court rules allow it. It should be found of on. It would give the mother an opportunity to literally just testify. Because the court could just remand it for that purpose under Strickland v. Washington for the procedural process. Again, you're raising an issue that's never been raised. It hasn't been preserved. It's a violation of Supreme Court Rule 341 to suddenly suggest that the attorney was ineffective. And I don't even know that that applies here. But Blissey v. Ferguson was the law of the land many years ago. And I understand that. But I'm saying that the unique circumstances, this is a child. And the mother doesn't understand. She believes the system conspired against her. And, in fact, it did. Because it's a de facto pattern and practice. The guardian ad litem actually said, this is what we do all the time because it's the attorney of record. The record would show that there's two different public defenders on this case. There's been three different judges. The judge who ruled on January 20 of 2017 only had written orders, the written permanency orders to rely on. He didn't have the transcripts. We had to order the supplemental transcripts. So, yes, there's 150 days. Mother's concerned about permanency. But it's unresolved. She never heard what her son had to say. And her son never heard what she had to say. And so the family is still fractured. And I think the preservation of the family and the best interests of the child are not mutually exclusive. Didn't the court explain to her exactly what the child's position was? In March 4 of 2016. That is correct. But the court also, when he said you can continue to fight, I'm saying that triggered an obligation for the court to inform, just like in the criminal trials, in the criminal court, that there's a duty to admonish the mother that she had a right to an interlocutory appeal. Because this is a fundamental federal constitutional right. And it's been recognized under Stanley v. Moore. And I know that's an argument of first impression. But the forfeiture bars the parties. It doesn't bar the judiciary from doing justice. And Supreme Court rules are rules that in the interest of equity and justice and the family, I think it can be relaxed. And that's what I find disturbing. This de facto assembly line justice of these private guardianships. And you're talking about March. There's April, May, June, July, October, November, December. Seven months later. They don't even send a motion, a petition. It's a petition. Certified mail to the mother at her last known address. This is a significant change. Do you really think that the court's decision in January of 2017 was in any way impacted by the mother's not appearing that day? Yes, because there was no right to confrontation. I realize it's not a criminal case. But this is a fundamental constitutional right. Do you think that the court actually, is there any suggestion in the record at all that the court thought the mother didn't want to oppose this? Is there any suggestion that the court really said in any way, shape, or form, you know, I find it's in the best interest of the minor to grant a private guardianship to this foster mother, because this mother isn't here and isn't telling me she wants something else. It's the absence. This is a third judge. I understand, but is there anything in the record that even suggests or hints at the idea? The court bottomed its decision on anything other than the best interest and it never suggested in any way, shape, or form that there was a lack of interest or a desire on the part of the mother to have her child return home. I think the record is devoid, since the public defender didn't only ask two questions on cross. She didn't even present the case in chief. It's totally absence. This is an attorney who may have been new, was the second attorney on the case, and from all indications, there was an abdication, an abandonment of her client's right to be present. And I say that with great reluctance, but the record speaks for itself. All right, Ms. Gill, thank you very much. Thank you, Your Honor. Thank you for the excellent argument and for your written presentation as well. We will take a matter under advisement and stand adjourned.